UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                              :

ASSOCIATION OF COMMUTER RAIL EMPLOYEES   :
LOCAL NO. 9,   :
                              :

              Plaintiff,      :              21-cv-5288 (LJL)
                              :

         -v-            :        <u>OPINION AND ORDER</u>
                              :

METRO-NORTH COMMUTER RAILROAD   :
COMPANY,   :
                              :

              Defendant.     :

---------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Defendant Metro-North Railroad Company ("MNR" or "Defendant") moves, pursuant to

Federal Rule of Civil Procedure 12(b)(1), to dismiss the complaint of plaintiff Association of

Commuter Rail Employees Local No. 9 ("ACRE 9," the "Union," or "Plaintiff") for lack of

subject-matter jurisdiction.  Dkt. No. 16.

      For the following reasons, the motion to dismiss is granted.

**BACKGROUND**

**I.    Parties**

      Plaintiff ACRE 9 is an unincorporated association and is the duly authorized bargaining

representative for persons employed by MNR as locomotive engineers as defined by the Railway

Labor Act ("RLA"), 45 U.S.C. § 151, Sixth.  Dkt. No. 1 ("Complaint" or "Compl.") ¶ 10.  MNR

engages in the transportation of passengers by rail in interstate commerce and is a "carrier" as

defined by the RLA.  *Id.* ¶ 11; *see also* 45 U.S.C. § 151, First.  Employees represented by ACRE

9 work at MNR.  Compl. ¶ 11.

ACRE 9 has been the collective bargaining representative of MNR locomotive engineers since 2000. *Id.* ¶ 12. ACRE 9 and MNR are parties to a collective bargaining agreement ("CBA") that governs terms and conditions of employment for MNR locomotive engineers. *Id.* ¶ 13. The CBA is governed by the RLA, which governs labor relations in transportation industries including railroads. 45 U.S.C. § 151. The CBA became amendable pursuant to terms of the RLA on June 30, 2019. Compl. ¶ 13.

## II. The Disputed Time Management System

On February 26, 2020, ACRE 9 gave MNR notice that it intended to change its agreement with MNR, which would affect pay rates, rules, or working conditions and would also initiate a lengthy bargaining process under the RLA. *Id.* ¶ 14. ACRE 9 invoked the services of the National Mediation Board ("NMB") under the RLA. *Id.* Under the RLA, "the parties are obligated to maintain the 'status quo,' and the carrier may not make unilateral changes to rate of pay, rules, or working conditions until the extensive process of bargaining and mediation set forth in Sections 5 and 6 of the RLA is exhausted." *Id.* ¶ 15.

In the 1990s, MNR set out to implement a new time and attendance system called the Crew Management System ("CMS") after bargaining with employees' predecessor union. *Id.* ¶ 16. The predecessor union and MNR entered into a letter agreement regarding CMS, which was incorporated into the CBA and has continued, unmodified, in all subsequent CBAs covering MNR locomotive engineers. *Id.* ¶¶ 16–17. Before CMS was implemented, the parties negotiated and agreed in a January 30, 1998 letter that, although engineers must "key in" at the beginning of their shift, they can "key out" at the end of the day or during the subsequent "key in" process. *Id.* ¶ 18. CMS has been used to track MNR locomotive engineers' working hours since it was agreed to in 1999. *Id.* ¶ 16.

2

In 2019, the Chief Employee Relations and Administrative Officer of the Metropolitan Transportation Authority ("MTA")—MNR's parent company—laid out plans to use "Kronos biometric timeclocks" ("Kronos") at all locations where MNR locomotive engineers report to work. *Id.* ¶ 21. Unlike CMS, such a system would require MNR locomotive engineers to have their fingers biometrically scanned when they arrive at work for the day and also at the end of the work day. *Id.* ¶ 22. After ACRE 9 expressed concern that the new system would present privacy concerns and violate a New York law, MNR and the Union met on various occasions between August 2019 and September 2019 to discuss the implementation of Kronos. *Id.* ¶¶ 23–24. After the meetings, in response to questions drafted by the Union, MNR provided proposed responses that demonstrated that employees would be required to "swipe in" at the start of each shift and at the end of each shift at a Kronos clock. *Id.* ¶ 26. Additionally, the answers demonstrated that employees would be subject to discipline for late or missed swipes and that finger scanning would be required and would begin on September 18, 2019. *Id.* That same day, ACRE 9 filed suit to enjoin the implementation of the Kronos system. *Id.* ¶ 27.

In light of the lawsuit, MNR delayed implementing the Kronos fingerprinting and swipe-out requirements, as the parties worked to resolve their differences as part of the then-ongoing Section 6 negotiations, though MNR did implement a Kronos swipe-in requirement. *Id.* ¶ 28. The Section 6 negotiations resulted in a Memorandum of Understanding ("MOU") reached on December 20, 2019, which addressed a number of different issues and memorialized agreements with respect to the Kronos fingerprinting and swipe-out requirements. *Id.* ¶ 29.[1] In Letter No. 5 to the MOU, "MNR stated that it would implement a 'mobile timekeeping mechanism' to allow

---

[1] The Memorandum of Understanding is set forth at Dkt. No. 18-2. This Opinion discusses only those understandings relevant to the particular issues raised in the motion.

locomotive engineers to 'remotely swipe out.'" *Id.* ¶ 30.  According to Plaintiff, "A.C.R.E. committed to comply with that program when rolled out, and the parties agreed to meet to discuss any additional timekeeping requirements 'prior to the implementation of mobile timekeeping.'"  *Id.*  The MOU said "if there were 'any change in the future with respect to Kronos timekeeping and its impact on either the terms of the collective bargaining agreement or compensation, the parties will meet to bargain those changes prior to the implementation.'"  *Id.* ¶ 32.  In Letter No. 5, ACRE 9 agreed to withdraw the lawsuit it had initiated, and MNR agreed not to require fingerprinting until April 1, 2020 or until the New York State Department of Labor determined that it could impose such a requirement.  *Id.* ¶ 33.

Around March 10, 2020, MNR announced it was delaying implementation of the Kronos fingerprinting requirement in light of the COVID-19 pandemic.  *Id.* ¶ 35.  A year later, on March 5, 2021, despite not having developed a mobile timekeeping mechanism, MNR announced that engineers must swipe out at the end of each day, effective April 12, 2021.  *Id.* ¶ 36.  The letter stated that "any employee who refuses to comply with the upgraded Kronos timekeeping program as directed will be subject to disciplinary action, up to and including dismissal."  *Id.* ¶ 40.  According to Plaintiff, MNR cited this Court's opinion in *Sanzari v. Metro-North R.R. Co.*, 2021 WL 467339 (S.D.N.Y. Feb. 9, 2021), which addressed the swipe-out requirement for MNR conductors, and claimed MNR had discretion to implement this new requirement without bargaining with the Union.  Compl. ¶ 37.

On March 18, 2021, ACRE 9 expressed its surprise that MNR "intended to unilaterally implement the swipe-out requirement" prior to implementing the mobile timekeeping system and to subject employees to disciplinary action for failing to comply despite what it claimed was the requirement in the MOU that it bargain such a change.  *Id.* ¶ 42.  MNR and the Union met on

March 26, April 1, and April 9 to try to negotiate the policy, but MNR refused to change the swipe-out requirement and disciplinary policy. *Id.* ¶ 43.  MNR issued a memorandum to all train and engine service employees on March 31, 2021, informing them of the swipe policy and stated that it was a "condition of employment at Metro-North." *Id.* ¶ 44.

The MOU required that MNR not use Kronos timekeeping for compensation purposes and, consistent with the MOU, MNR continues to track all hours for compensation purposes through CMS. *Id.* ¶¶ 46–47.  The purported purpose of the Kronos swipe-out requirement for other MTA employees is to more carefully track overtime hours and pay. *Id.* ¶ 48.  But Plaintiff claims that because engineers' hours are highly regulated and they use other forms of overtime, which are not tracked with Kronos, the purpose of the swipe-out requirement is irrelevant to locomotive engineers. *Id.* ¶¶ 48–50.  For example, engineers are subject to the Hours of Service Act, 49 U.S.C. §§ 21101–21109, which limits the number of hours an engineer can work and requires extensive recordkeeping; therefore, to comply with the recordkeeping requirements, MNR pre-populates an engineer's start and end times into CMS, which the engineer then certifies during the following tour of duty.  Compl. ¶ 49.  Also, engineer overtime is tracked without Kronos, and, for one type of overtime, it is calculated based on the scheduled and anticipated times of an assignment and not the time the engineer actually spends on the assignment. *Id.* ¶ 50.  There are also other kinds of overtime with various tracking systems. *See id.* ¶¶ 51–52.  Because of these systems, there is little ability for engineers to falsify their overtime hours. *Id.* ¶ 53.  Therefore, Plaintiff contends, there is no reason to change the policy and require engineers to swipe out at the end of their shift until a mobile timekeeping mechanism is developed. *Id.* ¶ 55.

Plaintiff alleges that the swipe-out requirement harms the engineers because "the additional time spent at the end of their tour of duty in reaching an authorized time clock . . . will result in more time spent at the engineer's final station and less time away from the work site." *Id.* ¶ 56; *see also id.* ¶¶ 57–58.  With a mobile timekeeping system, engineers would be able to swipe out on their mobile devices at the end of the day instead of having to find a Kronos clock at a train station.  *Id.* ¶ 59.  Finding a Kronos clock could take nearly twenty minutes, possibly causing an engineer to miss their connecting train home, and then the engineer may have to wait nearly an hour for the next train.  *Id.* ¶ 57.

## III.    **Plaintiff's Claims**[2]

Plaintiff brings this lawsuit seeking injunctive relief to prevent MNR from unilaterally implementing the Kronos swipe-out requirement and its attendant disciplinary policy.  Plaintiff claims that the unilateral implementation of these policies "alters established terms and conditions of employment of A.C.R.E-represented MNR locomotive engineers in the midst of RLA negotiations and without exhausting the mandatory mediation and status quo requirements of the RLA."  *Id.* ¶ 62.  Plaintiff asserts that, under the RLA, MNR has failed to "exert every reasonable effort to make and maintain agreements" and "to exhaust the RLA's mandatory bargaining process before unilaterally changing rates of pay, rules, and working conditions."  *Id.* ¶¶ 63–65.

Plaintiff also alleges that Defendant violated Section 2 First, Second, Third, and Fourth of the RLA, 45 U.S.C. § 152, by failing to "treat, confer, and bargain exclusively and in good faith

---

[2] In Defendant's memorandum of law in support of its motion to dismiss, Defendant states: "To the extent the Complaint is interpreted as raising a claim under N.Y. Labor Law §201-a . . . this state law claim should be dismissed."  Dkt. No. 17 at 17.  In its opposition brief, Plaintiff states that "ACRE does not assert [a §201-A] claim in this lawsuit."  Dkt. No. 24 at 3 n.1.  Therefore, the Court need not address any state law claims.

with A.C.R.E. with regard to rates of pay, rules, and working conditions for all employees in the class or craft of MNR locomotive engineers represented by A.C.R.E. and with regard to all disputes between A.C.R.E. and its locomotive engineers."  Compl. ¶¶ 68–69.

## PROCEDURAL HISTORY

Plaintiff initiated this action by filing a complaint on June 15, 2021.  Dkt. No. 1. Defendant filed the instant motion to dismiss on September 10, 2021, Dkt. No. 16; Plaintiff's opposition was filed on October 8, 2021, Dkt. No. 24; and Defendant's reply was filed on October 15, 2021, Dkt. No. 25.

## LEGAL STANDARD

A court properly dismisses a claim for lack of subject matter jurisdiction under Rule 12(b)(1) when it "lacks the statutory or constitutional power to adjudicate it."  *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.A.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (citation omitted).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "A motion to dismiss for lack of subject matter jurisdiction may 'raise a facial challenge based on the pleadings, or a factual challenge based on extrinsic evidence.'"  *U.S. Airlines Pilots Ass'n ex rel. Cleary v. US Airways, Inc.*, 859 F. Supp. 2d 283, 296 (E.D.N.Y. 2012) (quoting *Guadagno v. Wallack Ader Levithan Assocs.*, 932 F. Supp. 94, 95 (S.D.N.Y. 1996)).  Where the defendant challenges the legal sufficiency of a complaint's allegations, a court must treat all factual allegations as true and draw reasonable inferences in favor of the complaining party.  *Robinson v. Gov't of Malay.*, 269 F.3d 133, 140 (2d Cir. 2001).  However, where the jurisdictional challenge is fact-based, the defendant may "proffer[] evidence beyond the [p]leading," and the plaintiff "will need to come forward with evidence of their own to controvert that presented by the defendant 'if the affidavits submitted on a 12(b) motion . . .

reveal the existence of factual problems' in the assertion of jurisdiction." *Carter v. HealthPort Techs.*, *LLC*, 822 F.3d 47, 57 (2d Cir. 2016) (quoting *Exch. Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976)).  In that case, "no presumptive truthfulness attaches to the complaint's jurisdictional allegations," and "the burden is on the plaintiff to satisfy the Court, as fact-finder, of the jurisdictional facts."  *Guadagno*, 932 F. Supp. 94 at 95.

## DISCUSSION

Plaintiff argues that MNR has violated the RLA by unilaterally implementing the Kronos swipe-out requirement and attendant disciplinary policies without negotiating with the Union. Plaintiff seeks injunctive relief under the RLA to prohibit MNR from implementing these two policies until MNR has bargained in good faith with ACRE 9.  Its argument turns upon the provisions of the RLA and their application to the facts here.

## I.     The Railway Labor Act

The RLA, 45 U.S.C. § 151 *et seq.*, describes two classes of labor disputes and sets forth different procedures for their resolution.

Section 2 (Seventh) of the RLA provides: No carrier "shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements" or through the mediation procedures established in Section 6 of the RLA.  45 U.S.C. § 152 (Seventh).  For this class of disputes, "the RLA requires the parties to undergo a lengthy process of bargaining and mediation," and "[u]ntil they have exhausted those procedures, the parties are obligated to maintain the status quo, and the employer may not implement the contested change in rates of pay, rules, or working conditions." *Consol. Rail Corp. v. Ry. Lab. Execs.' Ass'n*, 491 U.S. 299, 302–03 (1989) ("*Conrail*") (citing 45 U.S.C. §§ 155–156).

Section 2 (Sixth) and Section 3 (First) address disputes arising or growing "out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions."  45 U.S.C. §§ 152–153.  For this class of dispute, the RLA requires the parties to engage in compulsory and binding arbitration before the National Railroad Adjustment Board or before an adjustment board established by the employer and the unions representing the employees ("Adjustment Board").  The Adjustment Board has exclusive jurisdiction over such disputes and judicial review of the arbitral decision is limited.  Unlike changes in the "rates of pay, rules, or working conditions" under Section 2 (Seventh), in the event of a dispute concerning the "interpretation or application" of existing agreements, the employer is not required by the RLA to maintain the status quo pending an Adjustment Board's decision.  *See Conrail*, 491 U.S. at 304.

Courts have adopted the term "major" to describe disputes falling in the first category. *Id.* at 302.  Disputes falling in the second category are considered to be "minor" disputes.  *Id.*

The classification of a dispute as major or minor under the RLA is consequential.  If a dispute is deemed to be one over a "change" to "the rates of pay, rules or working conditions of . . . employees," the employer and the union must engage in the "traditional voluntary processes of negotiation, mediation, voluntary arbitration, and conciliation." *Bhd. of Locomotive Eng'rs Div. 269 v. Long Island R.R. Co.*, 85 F.3d 35, 37 (2d Cir. 1996) (quoting *Elgin, J. & E.R. Co. v. Burley*, 325 U.S. 711, 725 (1945)); *see also* 45 U.S.C. §§ 151–58.  These processes have been "described by the Supreme Court as 'almost interminable[,]'" *Air Line Pilots Ass'n Int'l v. E. Air Lines, Inc.*, 863 F.2d 891, 895 (D.C. Cir. 1988) (quoting *Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union*, 396 U.S. 142, 148, (1969)), and indeed they are "purposely long and drawn out, based on the hope that reason and practical considerations will provide in time an

9

agreement that resolves the dispute," *Detroit & Toledo Shore Line R.R. Co.*, 396 U.S. at 149

(quotation and citation omitted); *see also Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp.

3d 59, 68 (D.D.C. 2017) (describing each stage of the procedure for resolving "major" disputes

under the RLA), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019).  That is because "[f]ailure of the virtually

endless process of negotiation and mediation established by the RLA for major disputes . . . frees

the parties to employ a broad range of economic self-help, which may disturb transportation

services throughout the industry and unsettle employer-employee relationships." *Conrail*, 491

U.S. at 311 (internal quotation marks and citations omitted).  Because the employer may not

implement a contested major change unilaterally, and "district courts have subject-matter

jurisdiction to enjoin a violation of the status quo pending completion of the required procedures,

without the customary showing of irreparable injury," *id.* at 303, a determination that a dispute

falls within this category can delay—sometimes indefinitely—the implementation of the change.

If a dispute is deemed to be minor and to grow "out of grievances or out of the

interpretation or application of agreements concerning rates of pay, rules, or working

conditions," by contrast, "a court cannot assert jurisdiction over the action nor can the parties

seek judicial remedies such as an injunction."  *Bhd. of Locomotive Eng'rs*, 85 F.3d at 37; *see*

*also Conrail*, 491 U.S. at 304 (Adjustment Boards "[have] exclusive jurisdiction over minor

disputes"); *Indep. Union of Flight Attendants v. Pan Am. World Airways, Inc.*, 789 F.2d 139, 141

(2d Cir. 1986) (same).  "The effect of [deeming a controversy to be minor is] to delay collective

bargaining in some cases until the arbitration process is exhausted," during which time the

contested policy will be in effect.  *Conrail*, 491 U.S. at 310.

The line between a change that is major and a dispute that is minor has been elusive.  The

language "change [of] rates of pay, rules or working conditions of its employees" and

"interpretation or application of agreements concerning rates of pay, rules, or working conditions" is not self-defining.  *Conrail*, 491 U.S. at 307 (noting difficulty of resolving "concrete cases" with "abstract words").  "[T]he formal demarcation between major and minor disputes does not turn on a case-by-case determination of the importance of the issue presented or the likelihood that it would prompt the exercise of economic self-help."  *Id.* at 305.  Nor does it turn entirely on pleading.  The law does not "lea[ve] the characterization of the dispute solely in the hands of one party."  *Id.* at 306.

Rather, the classification of a dispute as major or minor turns on the nature of the action or change sought to be made by the employer and whether "a claim has been made [by that party] that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action."  *Id.* at 305.  It is also animated by the underlying policy "of the RLA is to prevent service interruptions in the transportation industries by encouraging labor peace and avoiding strikes."  *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 943 F.3d 568, 573 (2d Cir. 2019) (citations omitted); *see also Int'l Ass'n of Machinists, AFL-CIO v. Cent. Airlines, Inc.*, 372 U.S. 682, 687 (1963) ("Congress has long concerned itself with minimizing interruptions in the Nation's transportation services by strikes and labor disputes.").

Since the Supreme Court's decision in *Elgin*, courts have classified a "major" dispute as one that concerns: "the formation of collective agreements or efforts to secure them.  They arise where there is no such greater agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy."  *Elgin*, 325 U.S. at 723.  A minor dispute, in contrast: "contemplates the existence of a collective agreement already concluded or . . . a situation in which no effort is made to bring about a formal change in terms . . . [and] relates either to the meaning or proper application of a particular provision."  *Id.*;

*see also Bhd. of Locomotive Eng'rs*, 85 F.3d at 37 (citing *Elgin*, 325 U.S. at 722).  In other words, "major disputes seek to create contractual rights, minor disputes to enforce them." *Conrail*, 491 U.S. at 302 (citing *Elgin*, 325 U.S. at 723).

In *Conrail*, the Supreme Court further articulated the basis for differentiating between major and minor disputes.  It provided:

> [I]f an employer asserts a claim that the parties' agreement gives the employer the discretion to make a particular change in working conditions without prior negotiation, and if that claim is arguably justified by the terms of the parties' agreement (i.e., the claim is neither obviously insubstantial or frivolous, nor made in bad faith), the employer may make the change and the courts must defer to the arbitral jurisdiction of the Board.

491 U.S. at 310.  "The Court noted that this standard reflects 'the "relatively light burden which the railroad must bear" in establishing exclusive arbitral jurisdiction under the RLA.'"  *Bhd. of Locomotive Eng'rs*, 85 F.3d at 38 (quoting *Conrail*, 491 U.S. at 307).  Thus, to find a major question, "[i]n essence, the court must conclude that any reasonable trier of fact would find virtually as a matter of law that the employer has violated the contract."  *Ass'n of Flight Attendants, AFL-CIO v. United Airlines., Inc.*, 976 F.2d 102, 105 (2d Cir. 1992).

Moreover, while "[i]n cases where a carrier contends that a given controversy is a minor dispute, courts have typically looked to the pertinent collective bargaining agreements to determine whether a plausible interpretation would justify the carrier's action," *CSX Transp., Inc. v. United Transp. Union*, 879 F.2d 990, 997 (2d Cir. 1989) (internal quotations omitted), the classification of a dispute as major or minor does not turn upon the four corners of the collective bargaining agreement alone.  A collective bargaining agreement is not a bond indenture.  The Supreme Court has held that "collective-bargaining agreements may include implied, as well as express, terms," and "it is well established that the parties' 'practice, usage and custom' is of significance in interpreting their agreement."  *Conrail*, 491 U.S. at 311 (quoting *Transp.-*

*Commc'n Emps. Union v. Union Pac. R. Co.*, 385 U.S. 157, 161 (1966)).  Moreover, as the

Supreme Court has observed:

> A collective bargaining agreement is not an ordinary contract for the purchase of
> goods and services, nor is it governed by the same old common-law concepts which
> control such private contracts . . . .  [I]t is a generalized code to govern a myriad of
> cases which the draftsmen cannot wholly anticipate . . . .  The collective agreement
> covers the whole employment relationship.  It calls into being a new common law—
> the common law of a particular industry or of a particular plant.

*Id.* at 311–12 (quoting *Union Pac. R. Co.*, 385 U.S. at 160–61); *see id.* at 318 ("[L]abor laws do

not require all the details of particular practices to be worked out in advance."); *see also Long*

*Island R. Co. v. Int'l Ass'n of Machinists*, 874 F.2d 901, 909 (2d Cir. 1989) (noting the district

court's consideration of "incidents of employment," such as "arbitration awards, operating rules

and attendance policies" in deciding whether a dispute was "major" or "minor").

Thus, the Second Circuit has held that in order to meet *Conrail's* "arguably justified test,"

"an employer need demonstrate only that a reasonable trier of fact could adopt the employer's

view of the contract."  *Bhd. of Locomotive Eng'rs*, 85 F.3d at 38 (quoting *Ass'n of Flight*

*Attendants*, 976 F.2d at 105).  To find that a dispute is "major," it is not enough for a court to

conclude a party challenging an employer's action "will likely succeed on the merits" as to

whether the operative agreement permits the action.  *Ass'n of Flight Attendants*, 976 F.2d at 104.

Rather, "[i]n essence, the court must conclude that any reasonable trier of fact would find

virtually as a matter of law that the employer has violated the contract."  *Id.* at 105.

## II.    Application of the standard

Plaintiff contends that MNR's implementation of the Kronos swipe-out requirement and

the attendant disciplinary policy changes the status quo and unilaterally changes rates of pay,

rules, or working conditions without bargaining under the RLA.  The resolution of whether the

dispute is "major" or "minor" for purposes of the RLA turns on the language of the CBA and the parties' "practice, usage and custom." *Conrail*, 491 U.S. at 311.

### A. This Court's Opinion in *Sanzari*

In *Sanzari v. Metro-North Railroad Company*, 2021 WL 467339 (S.D.N.Y. Feb. 9, 2021), this Court had occasion to decide a very similar issue regarding the same swipe-out requirement and attendant disciplinary policy.  In that case, the General Chairman of the Association of Commuter Rail Employees, Division 1 ("ACRE 1")—which represents conductors, yardmasters, assistant yardmasters, and stationmasters employed by MNR—brought suit to enjoin MNR from "unilaterally adopting and implementing the Kronos system until after the parties have engaged in the required bargaining pursuant to the RLA," *id.* at *4, specifically concerning the swipe-out requirement and the attendant disciplinary policy, *id.* at *7.

This Court looked to the two CBAs to which ACRE 1 and MNR are parties (one governing terms and conditions of employment for MNR conductors and assistant conductors and one governing terms and conditions of employment for yardmasters, assistant yardmasters, and stationmasters, *id.* at *1).  *Id.* at *8.  The CBAs had provisions regarding work start times and other provisions which contemplated benefits and requirements that were tied to the number of hours worked.  *Id.*  The Court concluded that it was at least "implicit in the collective bargaining agreement . . . that management would need a system to measure and determine when employees began and ended their shifts and that those systems would change with changes in technology."  *Id.* at *9.  The Court found that there was

> no evidence . . . that the parties intended by the collective bargaining agreement to freeze in place all of the terms of the existing crew management system unless and until the union agreed to the changes through collective bargaining or as a result of the purposefully long and drawn out process of negotiation and mediation or management prevail[ing] through the exercise by each side of economic self-help.

*Id.* The Court also stated that, as a matter of contract law, just because "a particular provision has not been expressly stated in a contract does not necessarily mean that no such covenant exists." *Id.* at *10 (quoting *Rowe v. Great Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 569 (N.Y. 1978)). It was at least arguably implicit from the parties' agreement that wages would be dependent on the number of hours each employee worked and that shifts would be of a specific duration, and therefore the parties understood that MNR would need to "create a timekeeping system for monitoring the duration of work shifts." *Id.*

This Court also looked to the pattern of practice between the parties, particularly the implementation of CMS in approximately 1997. *Id.* at *9. The pattern of practice included MNR announcing the implementation of CMS, the parties convening a Steering Committee to discuss the implementation of CMS, a letter from MNR which stated MNR's requirements of the employees regarding keying in and keying out, and a letter describing the resolution of various grievances, which had been resolved through a process which was not the same as the grievance process outlined in the CBA. *Id.* ACRE 1 also offered a declaration stating that it did not acquiesce to MNR's unilateral implementation of CMS, but ACRE 1 did not offer the letter itself. *Id.* The Court concluded that the evidence showed that "at least MNR believed that it had in 1998 and retained thereafter the right to make changes to the crew management system in response to changes in technology and the needs of MNR" and the "union cannot by its non-acquiescence make what from the collective bargaining agreements are minor disputes into major disputes." *Id.* at *10.

Overall, the Court concluded that the dispute over the unilateral implementation of the Kronos swipe-out requirement and attendant disciplinary policy was a "minor" dispute, and,

therefore, the Court lacked subject matter jurisdiction over the claim, and the claim was dismissed. *Id.* at *11.

### B. CBA Provisions and Historical Practice

The CBA provisions to which ACRE 9 and MNR are parties are similar to the CBA provisions the Court analyzed in *Sanzari*. Here, Defendant points to three CBA provisions—Rules 2, 39, and 41—to demonstrate MNR's "contractual authority to create or change employee reporting procedures." Dkt. No. 17 at 3–4; *see also* Dkt. No. 18-1.

Rule 2, entitled "Classifications And Basis of Pay"—which is nearly identical to a provision called "Rule 2" in *Sanzari*—comprises subsections (a) through (h). Subsection (a) lays out the rate of pay per hour for Passenger Engineers. Dkt. No. 18-1 at 9. Other subsections in Rule 2 contemplate benefits and requirements that are tied to the number of hours an employee has worked. *Id.* at 10–11. For example, subsection (b) states "Passenger Engineers will be paid for each trip or tour of duty at the straight-time rate for the first eight (8) hours on duty between the time they are required to report for duty until the time they are finally released on completion of service, and at the time and one-half rate for all time in excess of eight (8) hours on duty." *Id.* at 10. As in *Sanzari*, the parties' agreement that MNR would have to pay the engineers on the basis of the number of hours worked and would have to pay time and a half for overtime, at least arguably carries with it the implied understanding that management would have "a system to measure and determine when employees began and ended their shifts and that those systems would change with changes in technology." *Sanzari*, 2021 WL 467339, at *9.

Additionally, Defendant points to Rules 39 and 41. Rule 39, entitled "Itemized Statement Of Earnings," states that "Passenger Engineers will furnish all information required on timeslips so that proper identification for payments can be made." Dkt. No. 18-1 at 63. Rule 39 also states that "Passenger Engineers should use the itemized statement of daily earnings as the basis

for reporting any overpayments." *Id.* at 64.  Rule 41, entitled "Starting Times"—which is nearly identical to a provision called "Rule 50" in *Sanzari*—prescribes ranges of permissible start times for work shifts and states that "[r]egularly assigned Passenger Engineers engaged in yard, switching and classification work will each have a fixed starting time which will not be changed without at least forty-eight (48) hours' advance notice." *Id.*  These provisions too support that it was at least arguably implicit in the agreement that MNR would have "discretion to create a timekeeping system for monitoring the duration of work shifts."  *Sanzari*, 2021 WL 467339, at *10.

In addition, the practice, custom, and usage are similar to that in *Sanzari.*  For example, Defendant points to MNR's unilateral implementation of CMS in 1988 and a letter dated January 30, 1998, Dkt. No. 18-3, which this Court stated "makes clear that the ultimate decisions regarding the CMS system were made by MNR alone," *Sanzari*, 2021 WL 467339, at *9.  Additionally, Defendant proffers the January 13, 1999 letter MNR wrote to union representatives regarding the resolution of various grievances, which was also discussed in *Sanzari.*  Dkt. No. 18-1 at 102.  The letter states that "[t]he [Brotherhood of Locomotive Engineers and Trainmen] and [United Transportation Union] fully support the implementation of [CMS] and will cooperate in all reasonable steps necessary to implement this system.  Union and Metro-North officials will continue to meet after the system is put into place to discuss and resolve issues." *Id.* at 105.

Plaintiff contends that the "unbroken past practice" was that engineers could key out at the end of their tour of duty or that, during the next key in process, they could confirm that they completed their previous tour.  Dkt. No. 24 at 12.  By not changing this practice, Plaintiff argues,

it became an implied, binding term of the contract, which MNR then modified in unilaterally implementing the swipe-out requirement and attendant disciplinary policy.  *Id.* at 13.

In *Sanzari*, however, the Court rejected this precise argument.  The Court held that "the evidence d[id] not establish that MNR established such a consistent and invariable practice over time that the practice must be understood to have frozen in place and made any change in the practice in essence a clear breach of contract."  *Sanzari*, 2021 WL 467339, at *10.  "[O]nly '[p]ractices *accompanied by assurances of continuation*, express or implied but in either event likely to induce reliance, can create an implied obligation.'"  *Id.* (quoting *Chi. & N.W. Transp. Co. v. Ry. Labor Execs.' Ass'n*, 908 F.2d 144, 154 (7th Cir. 1990) (emphasis added in *Sanzari*)).

### C.  MOU and Letters No. 5 and No. 6

Plaintiff argues that *Sanzari* is distinguishable because in this case MNR and ACRE 9 came to an agreement regarding MNR's use of Kronos, which was memorialized as part of the MOU dated December 20, 2019, that is part of the CBA.  Compl. ¶¶ 28–29.  On the same day the MOU was agreed, Andrew J. Paul, the Vice President, Labor Relations of MNR, sent a letter marked "Letter No. 5" to Matthew Mitchell, the General Chairman of ACRE Division 9, to which Mitchell affixed his signature concurring, entitled "ACRE 9 Cooperation and Support in Kronos Implementation Program."  Dkt. No. 18-2 at 11.  The letter expressly "reflect[ed] the commitment made by ACRE 9 to cooperate and support Metro-North Railroad's Kronos Implementation Program for Locomotive Engineers" and contained ACRE 9's "acknowledge[ment of] the importance of accurately recording employee time and attendance, and [its] suppor[t of] Metro-North's efforts in this regard as reasonable, and within the Carrier's rights under the collective bargaining agreement, with the exception of Biometrics."  *Id.*  It then contains the following two paragraphs:

All Locomotive Engineers are currently swiping in on Kronos Timeclocks to reflect their attendance for the start of their assigned tour of duty. Metro-North plans to implement a mobile timekeeping mechanism for Locomotive Engineers that will allow them to remotely "swipe out" and record the end of their tour of duty by means of Metro-North-issued technology. Although the full Kronos Implementation Program for Locomotive Engineers is currently in the development stage, ACRE 9 hereby commits that the union and its members will fully participate and comply with the program when it is rolled out. The parties will meet to discuss any additional Kronos timekeeping requirements prior to the implementation of mobile timekeeping. In turn, ACRE 9 agrees to withdraw the litigation (Case 1:19-cv-08672) with respect to Kronos timekeeping that was served on Metro-North on December 6, 2019, without prejudice.

In the event that Metro-North's Kronos Implementation Program modifies any existing terms or conditions in the collective bargaining agreement, the parties will bargain those modifications.

*Id.*

The letter then goes on to express the parties' agreements with respect to biometrics, including that MNR would not require locomotive engineers to submit to biometrics until April 1, 2020 or until the New York State Department of Labor determined that MNR could impose such a requirement, whichever was first, and that in the event that MNR required biometrics in the absence of Department of Labor approval, ACRE 9 "reserve[d] its position that such unilateral implementation [wa]s unlawful." *Id.* at 12.

A subsequent letter of the same day ("Letter No. 6") "provides further clarification with respect to how Kronos timekeeping impacts daily compensation for Locomotive Engineers. Dkt. No. 18-2 at 13. It states, among other things, that "[e]mployees who complete their regular assignment will continue to be paid their Crew Book earnings as per the collective bargaining agreement" and that "monetary compensation will continue to be processed through the Crew Management System ('CMS')." *Id.* It goes on to include MNR's "acknowledge[ment] that if there is any change in the future with respect to Kronos timekeeping and its impact on either the

19

terms of the collective bargaining agreement or compensation, the parties will meet to bargain those changes prior to implementation." *Id.*

Plaintiff argues that MNR complied with the terms of this agreement from December 20, 2019 until March 5, 2021, by not requiring locomotive engineers to swipe out at the conclusion of their tour, but more than a year later, on March 5, 2021, abruptly changed its position without first developing the mobile timekeeping system.

ACRE 9 argues that Letter No. 5 reflects MNR's agreement that it would not require the locomotive engineers to swipe out before MNR had implemented the mobile timekeeping system. Dkt. No. 24 at 5. In its view, "[t]he premise of this agreement was the mobile timekeeping mechanism, thus avoiding all of the problems . . . with the additional time a locomotive engineer would need to spend to swipe-out at the end of their tour if they were required to return to the official swipe-out clock." *Id.* It was based on "this premise, and promise" that the Union agreed to "fully participate and comply with the program when it is rolled out." *Id.* at 5–6. Plaintiff argues that "when MNR unilaterally determined that it would start requiring swiping out before it had implemented a mobile timekeeping mechanism, it abrogated the MOU and created a major dispute." *Id.* at 10.

### 1. Letter No. 5 Analysis

Defendant has demonstrated that "a reasonable trier of fact could adopt the employer's view of the contract" that it did not prevent MNR from unilaterally adopting the swipe-out requirement. Plaintiff has not shown that Defendant's "contractual argument is 'obviously insubstantial or frivolous, [or] made in bad faith.'" *Ass'n of Flight Attendants*, 976 F.2d at 105 (quoting *Conrail*, 491 U.S. at 307). Read in context, there is at least a "reasonable" argument that the effect of Letter No. 5 was to reflect the understanding that ACRE 9 would not view the requirement that its members swipe out as part of the implementation of a mobile timekeeping

mechanism to be a violation of the CBA and that ACRE 9 would commit its members to "fully participate and comply with the program when it [wa]s rolled out."  Dkt. No. 18-2 at 11.  In exchange, MNR agreed to "meet to discuss any additional Kronos timekeeping requirements prior to the implementation of mobile timekeeping."  *Id.*

Letter No. 5 does not contain any agreement by ACRE 9 that it would not challenge the implementation of a swipe-out requirement prior to the implementation of the mobile timekeeping mechanism or that its members would comply with such a requirement.  By the same token, however, it also did not contain any agreement by MNR that it would *not* unilaterally implement such a requirement or that it could only require swiping out as part of a mobile timekeeping system.  For the most part, it was silent with respect to the issue.

The letter thus is reasonably interpreted to express ACRE 9's agreement that it will comply with the "Kronos Implementation Program" when the "Kronos Implementation Program" is rolled out, and not that the only circumstances in which MNR may require members to swipe out is if the mobile timekeeping mechanism is rolled out.  The letter states only that once the "full Kronos Implementation Program" is rolled out, union members will "fully participate and comply."  It does not imply that prior to such implementation union members have a right not to comply specifically with a swipe-out requirement.

Moreover, Letter No. 5 does not contain a promise by MNR to bargain the implementation of a swipe-out requirement prior to the implementation of the mobile timekeeping system.  Letter No. 5 states: "In the event that Metro-North's Kronos Implementation Program modifies any existing terms or conditions in the collective bargaining agreement, the parties will bargain those modifications."  Dkt. No. 18-2 at 11.  It also states, however, that the parties will only "meet to discuss" any additional Kronos timekeeping

requirements prior to the implementation of mobile timekeeping.  *Id.*  At best, then, it is agnostic as to whether the swipe-out requirement is a modification of an existing term or condition of the CBA.  If it is, then MNR is obligated to bargain.  But, if it is not, then there is no requirement to bargain.  Either way, however, the Court has already determined that the CBA provisions and Letter No. 5 can reasonably be interpreted as not making the swipe-out requirement conditional on mobile timekeeping a term or condition of the CBA.  Therefore, it follows that there is a reasonable interpretation that Letter No. 5 does not obligate MNR to bargain the implementation of a swipe-out requirement prior to the implementation of a mobile timekeeping system because the implementation of the swipe-out requirement did not "modif[y] any existing terms or conditions in the collective bargaining agreement."  *Id.*

### 2.    Letter No. 6 Analysis

Turning to Letter No. 6, that letter on its face does not purport to amend or revise the understandings reflected in Letter No. 5.  It begins: "This letter provides further *clarification* with respect to how Kronos timekeeping impacts daily compensation for Locomotive Engineers."  Dkt. No. 18-2 at 13 (emphasis added).  Two points are apparent from that opening sentence.  The letter provides "clarification" as to what has been expressed previously or simultaneously and does not purport to change anything.  *See Clarify*, Merriam-Webster, https://www.merriam-webster.com/dictionary/clarify (last visited April 24, 2022) ("[T]o make understandable; to free of confusion.").  In addition, what the letter clarifies is how Kronos timekeeping impacts daily compensation and not any more general understandings with respect to Kronos timekeeping.

Letter No. 6 then goes on to express the parties' understandings with respect to the impact of the Kronos Implementation Program on the terms and conditions of the CBA and compensation.  It states with respect to the impact on the terms and conditions of the CBA:

"When the Kronos Implementation Program is fully put into practice, all terms and conditions of the collective bargaining agreement will remain in effect."  Dkt. No. 18-2 at 13.  It states with respect to compensation: "Employees who complete their regular assignment will continue to be paid their Crew Book earnings as per the collective bargaining agreement" and "monetary compensation will continue to be processed through the Crew Management System" and that "Kronos timekeeping records will be used to evaluate compliance with [the procedures regarding attendance] and to verify unscheduled overtime."  *Id.*

Plaintiff puts weight on the last sentence of Letter No. 6.  That sentence reads: "Metro-North Railroad acknowledges that if there is any change in the future with respect to Kronos timekeeping *and* its impact on either the terms of the collective bargaining agreement or compensation, the parties will meet to bargain those changes prior to implementation."  *Id.* (emphasis added).  The Union would read from that sentence a commitment by MNR to bargain any changes in the future with respect to Kronos timekeeping.  But the sentence cannot bear the weight that Plaintiff puts on it.  Letter No. 6 must be read, as all agreements are read, in context and in a manner that gives effect, if possible, to all of the words in it.  *See Kass v. Kass*, 696 N.E.2d 174, 180–81 (N.Y. 1998) ("Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole . . . ."); *Int'l Klafter Co. Inc. v. Cont'l Cas. Co. Inc.*, 869 F.2d 96, 99 (2d Cir. 1989) (noting that courts "must look to 'all corners of the document' rather than view sentences or clauses in isolation" (quoting *Tougher Heating & Plumbing Co., Inc. v. New York*, 423 N.Y.S.2d 289, 290–91 (3d Dep't 1979))).  In addition, since Letter No. 6 was drafted at the same time as Letter No. 5 and refers to "clarification," Letter No. 5 and Letter No. 6 should be read as a whole so that no provision in one letter renders another provision illusory or surplusage.  *See HSBC Bank USA v. Nat'l Equity Corp.*, 719 N.Y.S.2d 20,

22 (1st Dep't 2001) ("It is an elementary rule of contract construction that clauses of a contract should be read together contextually in order to give them meaning."); *Scholastic, Inc. v. Harris*, 259 F.3d 73, 83 (2d Cir. 2001) ("In determining whether a contract is ambiguous, a court must look at the entire integrated agreement, to safeguard against adopting an interpretation that would render any individual provision superfluous."  (internal quotation marks omitted)).

In construing Letter No. 6, it is apparent that the last sentence does not contain an obligation by MNR to bargain all changes to Kronos timekeeping.  That reading would render as surplusage the limiting language that follows the reference to "any change in the future with respect to Kronos timekeeping."  The remainder of that clause expressly limits MNR's obligation to bargain only such changes in the future that have an "impact on either the terms of the collective bargaining agreement or compensation."  On Plaintiff's reading, MNR would be obligated to bargain regardless of whether a change would have an impact on the CBA or on compensation.  Indeed, on Plaintiff's reading, any change would have an impact on the CBA thereby rendering that limiting language superfluous.  Plaintiff's reading also would contradict the language of Letter No. 5 that carefully distinguishes between "additional Kronos timekeeping requirements prior to the implementation of mobile timekeeping" and modifications to the "existing terms or conditions in the collective bargaining agreement" that are affected by the Kronos Implementation Program and requires bargaining only to the latter and not to the former.

Furthermore, the weight Plaintiff puts on the last sentence of Letter No. 6 is misplaced because the letter merely says that MNR "*acknowledges* that if there is any change in the future with respect to Kronos timekeeping and its impact on either the terms of the collective bargaining agreement or compensation, the parties will meet to bargain those changes."  Dkt. No. 18-2 at 13 (emphasis added).  The word "acknowledge" suggests that MNR is merely

recognizing an agreement reached earlier or as part of some different instrument, rather than creating a new obligation and undermining a previous agreement.  It might evidence an obligation already reached; it does not create a new one.  *See Acknowledge*, Merriam-Webster, https://www.merriam-webster.com/dictionary/acknowledge (last visited April 24, 2022) ("[T]o recognize the rights, authority, or status of; to disclose knowledge of or agreement with; to recognize as genuine or valid.").

Thus, a plausible reading of Letter No. 6, which reads the letter as a whole, is that the reference to "impact on either the terms of the collective bargaining agreement or compensation" in the last sentence refers back to the discussion of the terms of the collective bargaining agreement and to compensation in the first paragraph.  MNR will bargain changes to Kronos timekeeping that, contrary to the first paragraph, result in all terms and conditions of the CBA not remaining in effect.  It will also bargain changes to Kronos timekeeping that result in employees not being paid their Crew Book earnings or having their compensation processed through CMS or some other change to compensation.  It will not necessarily be bound to bargain any changes to Kronos timekeeping that are implemented prior to the implementation of mobile timekeeping.  The two letters thus do not do for Plaintiff what Plaintiff would need them to do: convert the dispute into a major one.

It may have been the assumption of ACRE 9 that a mobile timekeeping mechanism was forthcoming and that engineers would never have to swipe out without such a system and thus would not have to spend time finding a Kronos clock at the end of their tours of duty and possibly miss their scheduled trains home.  However, the CBA and letters could plausibly be read to not bind MNR to implementing a mobile timekeeping mechanism prior to implementing a swipe-out requirement and an attendant disciplinary policy.

As in *Sanzari*, the Court emphasizes that it has only decided that MNR has carried its "relatively light burden" to make an "arguably justified" claim that it had the power to implement the swipe-out requirement and attendant disciplinary policy. The Court is "not now deciding which party will ultimately prevail on the merits as to whether the contested policies are permitted by the CBA." *Sanzari*, 2021 WL 467339, at *11.

## CONCLUSION

Because the question presented in this case is a minor dispute, the motion to dismiss for lack of subject-matter jurisdiction is GRANTED, and the Complaint is DISMISSED without prejudice.

The Clerk of Court is respectfully directed to close Dkt. No. 16.


SO ORDERED.


Dated: April 25, 2022
      New York, New York                                 LEWIS J. LIMAN
                                          United States District Judge